BURKE, Judge,
dissenting.
I respectfully dissent from the majority’s holding that the trial court erroneous *840 ly Consolidated Tillman’s forged-instrument and murder charges. In addition to the facts set forth by the majority, the following facts are relevant to this dissent.
In February 2001, Cincinnati Life Insurance Company issued a flexible-premium adjustable life-insurance policy naming Janet as the insured. Tillman was the primary beneficiary of the policy. (C. 264-85.)
Shortly after Tillman was elected to serve as the pastor of the Vincent Revival Center, he went to the office of the district council to ask permission to pastor that congregation. On that day, Tillman was offered an application to be credentialed, but he declined to accept it. Tillman stated that he was moving and that he would misplace the application. On May 20, 2003, and July 20, 2004, applications were mailed to Tillman, but they were never returned. On October 24, 2005, two days before Janet’s death, Tillman was handed an application by Edward Wilson, who was the secretary/treasurer of the district council. Wilson testified that he was being insistent when he handed the application to Tillman. Approximately five months after Janet’s death, Tillman completed the preliminary application, but he never completed the official application. Within two months after he completed the preliminary application, Tillman resigned from his position at Vincent Revival Center.
As the majority notes, before Janet’s death, Tillman had begun an intimate relationship with a woman who lived in Mississippi. Tillman falsely represented to the woman and her family that he was a divorced United States Navy officer and that his name was Timothy Patrick McNally. In May 2005, Tillman wrote letters to the woman, stating that the woman was his “soul mate” and that he could not live without her. The letters also stated that he looked forward to her being a mother to his daughters and sharing their family life together forever. In the letters, Tillman referred to the woman in Mississippi as his “wife.” In August 2005, Tillman proposed marriage to the woman, and she accepted.
On October 11, 2005, near the date of the first scheduled turkey shoot at the church, Tillman wrote a letter to the father of the woman in Mississippi. In that letter, Tillman stated that “[the woman] and I will be married soon, could be a month, maybe two, it might even be after the first of the year, but nevertheless we will be married.” (C. 205-06.)
Jimmy Abbott, a member of Vincent Revival Center, was present at the turkey shoot that took place on October 22, 2005. After the shoot was over, Abbott checked the guns to make sure they were unloaded, and he laid the guns on the back of his truck. One of the guns, a bolt-action gun, was jammed. Abbott testified that he was “positive those guns were unloaded.” (R. 164.) After Abbott had checked the guns, another member of Vincent Revival Center, Mark Green, and Tillman rechecked the guns to make sure they were unloaded. According to Green, after he and Tillman checked the guns, they gathered the guns into their arms and placed them in the trunk of Tillman’s vehicle.
As the majority notes, on October 26, 2005, Janet died of a gunshot wound to the back suffered while she and Tillman were in the parsonage behind the church. Tillman admitted that he was holding the gun that fired the fatal shot, but he said he was attempting to adjust the guns in his hands as he carried them when one of the guns accidentally fired and the shot struck Janet in the back. The State presented testimony that tended to show that the shooting could not have occurred as Tillman had described; a firearm expert offered by the defense testified that the shooting was consistent with an accident. A Remington *841 brand ammunition box that contained four unSred 12-gauge shot shells was collected from the scene of the shooting. The length of those shells was two and three-quarter inches, and the shot size of the shells was eight. The firearms examiner that examined the scene testified that those unfired shells were the same type of shell and from the same manufacturer as the fired shell that struck and killed Janet.
Also, the State presented evidence from which the jury could have found that Tillman attempted to alter the testimony of one of his daughters. On October 26, 2007, the daughter gave affidavit testimony concerning what she recalled regarding the circumstances of Janet’s death. (C. 232-34.) The State presented a letter written by Tillman to the woman in Mississippi in which Tillman made line-by-line suggestions for changes to his daughter’s affidavit testimony. Concerning her affidavit testimony, the letter from Tillman to the woman in Mississippi states, in relevant part:

“1 par lines 10-12:

“Seemed like he was carrying the guns chest height and was repositioning them as he walked.
“line 18: I didn’t even know [my daughter] was in the room — maybe she could say that — T don’t think my Dad knew I was in the room.’
“line 21: Fact: I never left the room— does she mean I went back to be next to her mom?
“End of Par 3: Over the past two years — she needs to communicate that I have not coached her. In fact I have spoken very little about the specifics of the accident ... I let her deal with it in counseling.
“Page 2 — Paragraph 5: I told her I would replace the money as soon as her mom’s life insurance paid off — that was my original plan
“Page 2 — Last Paragraph: Maybe ‘before Feb 2007 my dad already explained to me his previous relationship with [the woman in Mississippi] and before his arrest he already explained to [the woman in Mississippi] prior to his arrest in Feb about his marriage to Mom.
“[The woman in Mississippi] — Remember the Park?
“TAKE OUT THE PART: ‘Because he was scared of losing her’ ”
(C. 230.)
Rule 13.3, Ala. R.Crim. P., provides, in relevant part:
“(a) Offenses. Two or more offenses may be joined in an indictment, information, or complaint, if they:
“(1) Are of the same or similar character; or
“(2) Are based on the same conduct or are otherwise connected in their commission; or
“(3) Are alleged to have been part of a common scheme or plan.
[[Image here]]
“(c) Consolidation. If offenses ... are charged in separate indictments, in-formations, or complaints, the court on its own initiative or on motion of either party may order that the charges be tried together ... if the offenses ... could have been joined in a single indictment, information, or complaint.”
“A trial court is vested with substantial discretion in deciding whether to consolidate cases, and its decision as to consolidation will be reversed only for a clear abuse of that discretion.” Culver v. State, 22 So.3d 499, 507 (Ala.Crim.App.2008). “An important policy behind both state and federal rules governing joinder of offenses is that of trial convenience and economy of judicial and prosecutorial resources.” *842 Langham v. State, 494 So.2d 910, 915 (Ala.Crim.App.1986).
In the present case, contrary to the majority’s holding, the forgery and murder charges are “connected in their commission”; thus, the trial court did not exceed its discretion in consolidating the charges for trial. At the time Tillman committed the forgery, he had been unable to collect the proceeds from Janet’s life-insurance policy because of the continuing investigation into whether he murdered Janet. As Tillman admits in his brief, he forged Janet’s name on the loan check and deposited it into the bank because he “was in dire financial straits from the loss of his wife’s income.” (Tillman’s brief at 27.) The majority states that “[i]n fact, the forgery could have occurred and Tillman could have been prosecuted for that crime whether Janet was dead or alive.” 89 So.3d at 837. Although it is true that Tillman could have committed the forgery whether Janet was dead or alive, the evidence indicated that, in fact, Tillman committed the forgery because Janet was dead and her death had caused Tillman financial difficulties. There is no evidence indicating that Tillman would have committed the forgery if Janet was alive. Therefore, the forgery was motivated by, and was a direct result of, Janet’s murder; thus, the two charges were connected, and the trial court did not exceed its discretion in consolidating the charges for trial. See, e.g., Bayless v. United States, 381 F.2d 67, 71-72 (9th Cir.1967) (holding that under the rule providing that separate offenses may be joined if the offenses are “two or more acts connected together,” escape and burglary were suitable for joinder because evidence of the first offense was admissible to show the defendant’s motive for committing the second offense).
Moreover, even if the consolidation of the two charges was improper, Tillman has not established that the improper consolidation constituted reversible error. As the majority acknowledges, “the harmless error doctrine is applicable to misjoinder; misjoinder requires reversal ‘only if the misjoinder results in actual prejudice because it “had substantial and injurious effect or influence in determining the jury’s verdict.” ’ United States v. Lane, 474 U.S. 438, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).” King v. State, 518 So.2d 880, 884 (Ala.Crim.App.1987).
Tillman has not established that the joinder of the two cases resulted in actual prejudice to him. It is undisputed that Tillman shot Janet, but he claimed that the shooting was an accident. Thus, the question for the jury was whether the State met its burden of proving beyond a reasonable doubt that the shooting was intentional. However, the question for this Court on appeal is whether, in light of all the evidence, the jury’s exposure to the evidence concerning the forgery had a substantial and injurious effect or influence in determining the jury’s verdict on the murder charge.[5] Actual prejudice cannot simply be inferred from the exposure itself. It must be shown that the presentation of the forgery evidence had some influence upon the jury.
As the majority states, “the State’s evidence in the murder ease indicated that Tillman was a liar.... ” 89 So.3d at 839. Presenting evidence that Tillman forged Janet’s name on the loan check was, in effect, merely cumulative evidence that further showed Tillman’s dishonesty. Furthermore, the State’s evidence indicat *843 ing that Tillman intentionally shot Janet was, though weaker than Tillman’s outright admission that he forged Janet’s signature on the check, clearly weighty. The State presented a substantial amount of evidence indicating that Tillman intentionally killed Janet so that he could collect the proceeds from her life-insurance policy, prevent or delay the release of damaging information about himself, and move on with his life with the woman in Mississippi. It is undisputed that Tillman shot Janet with a deadly weapon. No one, other than Tillman, actually saw the shooting. The State presented witnesses who explicitly testified that the guns were unloaded when they were placed in Tillman’s vehicle. A partially used ammunition box containing shells that matched the fired shell that killed Janet was found in Tillman’s house. A fair inference is that, at some point, Tillman loaded the gun before bringing it into the house. The defense gave no explanation concerning how the gun got loaded before it was fired at Janet. The State also presented testimony that tended to show that the shooting could not have occurred as Tillman had described. Additionally, the State presented evidence indicating that Tillman was attempting to influence his daughter’s testimony, and, thus, the jury could consider that evidence as evidence of Tillman’s consciousness of guilt.
I conclude that the State presented a substantial amount of evidence indicating that Tillman intentionally shot Janet. I further conclude that, considering the wealth of other evidence indicating that Tillman was a liar and an adulterer, the evidence indicating that Tillman forged his wife’s signature after her death did not add anything to the State’s evidence that made it more likely that the jury would unfairly convict Tillman of murder based on an unrelated incident. Therefore, the consolidation of the cases did not substantially influence the jury’s verdict on the murder charge and, thus, no actual prejudice resulted, and the reversal of the experienced and learned trial judge’s decision to consolidate the cases is not required. The majority’s unfortunate decision to reverse the trial court’s judgment and to require separate retrials for each charge will only serve to place a further strain on scant judicial resources and to further delay justice to the victims of these crimes, which were committed more than five years ago. Moreover, considering the severity of the murder of his wife, it seems misplaced to reverse Tillman’s convictions on the basis that the murder charge was consolidated with the charge related to Tillman’s admitted forgery of his wife’s name on a loan check.
Based on the foregoing, I respectfully dissent.
WINDOM, J., concurs.

. Tillman does not allege that evidence concerning the murder had a substantial and injurious effect or influence in determining the jury’s verdict on the forgery charge.